Mutual Insurance vs. Timothy Shaw. Ms. Kachosky? Yes. Am I pronouncing your name correctly? Exactly. Okay, good. You may come up here if you wish. I stand before the court today to respectfully request that the error committed by the trial court on the issue of whether or not the employer liability exclusion contained within the Nationwide Mutual Insurance policy was applicable to the underlying loss. You've asked for some rebuttal time? Yes, five minutes, Your Honor. Okay, fine. Thank you. This is a factually odd case in that the insured at issue on the Nationwide Mutual Insurance general liability policy are the insured is Shaw Brothers Donkey Ball Company and that is an entity that basically is an exhibition company and it provides live donkeys for the usage of individuals playing basketball. Good. We are, I think, quite aware of the facts in this very interesting case, obviously with tragic consequences. Yes, of course, Your Honor. And the issue is whether summary judgment should have been granted in this matter, whether there were some factual issues. And we're aware that there is conflicting testimony. There was a prior case in which the injured man gave some statements that contradicted the statements that were made in this case about how often he cleaned out the barn and did other chores. But it seems that what he was doing was perhaps not so unusual in a rural setting when farmers and people that work in these areas help one another out. I mean, he only got paid some gas money, 5 to 15 bales of hay worth 80 cents a bale. Why at least isn't he a volunteer, a voluntary employee? If not, well, you go on. Yes, Your Honor. With respect to the issue of consideration given to him for his services, I think that the record reflects that if you look at all of the appendix pages of Appellant 407, there was testimony that he received, Mr. Eisenberg received, not only hay but also cash in the usage of the truck of his employer. This is a very low penalty, and bartering for services is commonplace. And in fact, even Mr. Shaw testified that he himself would perform tasks for other farmers meaning that he would basically mow their farm in exchange for receiving their hay. And the hay is not a small matter. The hay, if you look at the testimony of Mr. Eisenberg, he said that he received up to 15 bales of hay per month from Mr. Shaw. And there is some testimony that those bales range from 20 to 80 pounds per bale. And there was also testimony from Mr. Eisenberg that the larger bales could cost him or her to possibly $25. So if you look at $25 per bale and you use 15, if you didn't receive 15 bales per month according to some of his testimony, that's actually the equivalent of $325 per month. Isn't the issue not what the monetary value of whatever the barter was? I thought the issue was, in the one instance, he said, I go to the farm every Saturday and Sunday and whenever needed. And Shaw, during the same court action, took an entirely different view. And then in the affidavit, in this action, Eisenberg distanced himself from the original statement of coming to the farm with regularity with a statement, you know, 10 or 12 times a year, which that subsequent affidavit is now in line with what Shaw said in the tort action. I thought that was the issue and not, you know, the monetary value of the farm. Yes. Well, I think absolutely one of the issues on this appeal is definitely whether or not the affidavit qualifies as a shearing affidavit pursuant to the rules in interpretative case law and whether or not it should have been considered by the trial court in reaching this conclusion. And my position, of course, is that it was a shearing affidavit in that it was an affidavit that was produced after the close of discovery, after the entire record had been developed, but only produced by attachment to a motion for some rejection filed by the attorney. And the content of that affidavit expressly contradicted a number of the items of testimony that have been administered by Eisenberg previously. And to give the court just a brief description or example of this, you know, we know there's a difference in the various things that Eisenberg said in the tort action and subsequent depositions and so forth. Let me ask you, it seems to me that both the attorneys as well as the district court may have gone off on a tangent here. The question was whether or not he qualified as an employee under the Workman's Compensation Act. I disagree with you, Your Honor. This seems to me that everyone, including the district court, completely missed the point. Yes. The following here is applying for Workman's Compensation, which is a very narrow definition of what is an employer and so forth. The only question here is whether Mr. Eisenberg was an employee under the common law of Pennsylvania. That question was never settled in the district court as far as I could see. Yes, Your Honor, if I may briefly. The district court looked to the policy language itself. And in the face of the policy, it basically looked at the definition of an employee. And it said that the policy basically gave a definition of an employee by a comparison as opposed to a positive definition. And the trial court correctly in my opinion concluded that that policy still allowed Mr. Eisenberg to qualify as an employee. The trial court was something of a positive definition. So we asked counsel to look to a third-party source. Both parties agreed that the Worker's Compensation Act definition would give the best guidance in this instance. Well, if the point both parties want is that under the policy, the only question is not whether he qualifies as an employee under the Worker's Compensation Act. It's whether he was an employee under the law of Pennsylvania. And if he is an employee, then you have a pure question of fact as to whether or not he's excluded from coverage. And it may be a question of law if it's so clear that no reasonable jury can conclude otherwise that he worked and received some remuneration. The amount doesn't make any difference. Or that there's a question of fact for the jury to determine under a proper charge as to whether or not the limitation excludes him from coverage. I agree, Your Honor. I agree wholeheartedly that my position at the end of the cross motions for summary judgment was that if nothing else, there was an issue of fact that should have been resolved by a jury due to the lack of contradictory testimony and record errors on the issue of employment. I think that with respect to the Worker's Compensation analysis, I think basically that was just because when you look at what's commonly referred to as the employee liability exclusion and general liability policy, the purpose of that exclusion in those policies is basically because the employer is not undertaking or to assume the risk of, or the insurance company is not underwriting the risk of injuries to employees or issues of general liability policy. The whole point being is because of the Worker's Compensation analysis. Someone may not be an employee under Worker's Compensation because the employee is a casual employee. But under general law, under common law, a casual employee is an employee of a certain kind, not a regular one, but is an employee. Yes, Your Honor. So the two statutes are not mutually exclusive. The coverage and the concept are not exclusive. I agree, Your Honor. I agree with every point you're making.  I think it should have been the motions for Somerset judgment should have been denied. Well, you moved for Somerset judgment as well. I did, Your Honor. That was based upon the record evidence that was developed. My position is it wasn't until the affidavit was created, post-conclusion of discovery, post-closure. Can I move on to one other issue? That bothers me and I won't take up your time. No, of course. Just straighten this out. What was the tort recovery for Mr. Eisenberg? How much did he recover from the jury? Well, it was a stipulation, Your Honor. It was $1 million. How much? $1 million. And how much did New York Mutual pay coverage for the barn? By recollection, it was $200,000. So there's $300,000 that either Mr. Shaw's got to pay personally or his carrier, correct? No, Your Honor. The $1 million is the nationwide loss of money. There was a stipulation by all the carriers. Basically, they said that we do not think that there's coverage in the statistics, but we are going to go to a declaratory definition and have the court make that decision. And so if the court concludes that he was not an employee, then the $1 million from the nationwide policy is on the table. Your position, however, is that the New York Mutual policy covered the barn and that the policy that is before us right now, the nationwide, only covers the performance of the business. Absolutely, Your Honor. In fact, if you look at the declaration page, it was one of the issues. The declaration page for the nationwide policy, again, was just a general liability policy for the operation of the business. It was an exhibition business, so it was not for the nationwide policy. Just read that to me. I read it, the coverage page of the policy that says it's only for the business. And if it is only for the business, is it part of the business taking care of these 80 mules or 60 mules, whatever it was? Yeah, I understand, Your Honor. That's going to be the position of your friend across the aisle, that part of the business of putting the show on the road is take care of these mules that have to be fed and their stalls mucked out. Yeah. First of all, Your Honor, with that page, I don't know if that's— I'm not sure if that's extremely material to the evidence from the court in my opinion today. But on that issue, the declaration sheet is basically the information that the insured gives to the insurance carrier to basically ask them for coverage. And it asks what property do you own, lease, automobile, whatever. And the answer to that by an insured was his residence in Pennsylvania. The barn in which he was issued here was located in New York, and the existence of the barn, that was disputed as well, whether or not the existence of the barn located in New York was ever disclosed to a nation about to exist. But because of that, New York Mutual covered the barn. That was the property and insurance policy that covered the barn itself. Yeah, but that's a cheap policy or a limited policy. The coverage was only $100,000. So the question is, if your adversary is going to say that the barn is part of the business, even though it wasn't declared, I mean, what is wrong with that argument? I have no problem with that argument. In fact, I mean, I say here today before you and tell you that that's fine  and, therefore, he was acting in fervence of Shaw's business when he was moving the stack of banks and the barn fell through. So I have no problem before the court today to concede that the barn was used as part of the business. As part of the business. As part of the coverage for Nationwide Mutual. Yes, Your Honor. Okay. My argument before this court is really primarily exclusively on the issues as to whether or not he qualifies as an employee. And our position is that he does qualify as an employee, not only in the face of the policy, but also based upon the non-contributive case law. And as an aside, I would just, the court is very correct in stating that there was somewhat of a tangent in the Tafler's opinion and in the case of DeVries. But the primary issue that was dealt with by the Tafler was on the issue of employee status. It was basically, he looked at the Worker's Compensation Act and he said that anyone who receives valuable consideration, in my opinion, Your Honor, the definition of an employee, including the Worker's Compensation Act 773S22, which was codified, that's the same definition that's been in place since 1915. It's never changed. So that definition applies. Is there any chance that he's a voluntary worker? No, Your Honor. First, I think the trial court addressed that, and I think they did so correctly, because he's not a voluntary worker because if you look at the policy, it defines voluntary worker, and it says that that's something that does something opportunistically. It receives up to a year of consideration for the services, and there has been, I think, an unspeakable impact to this record that he did, in fact, receive consideration for the services. So your bottom line is, your prayer for relief here is that it be granted to the district court for it to determine whether or not he's an employee under the common law of the state of Pennsylvania. Yes, my request to hear today is for the court to conclude that there's enough evidence to conclude that he was an employee. As a matter of law, do you want us to conclude that he was an employee? Yes, Your Honor. Do you want us to do that, to demand to the district court for that purpose? Yes, Your Honor. Any other issue that you think should be before the district court? No. And you think it was improper for the district court to look to the Workers' Compensation Act to assist in making a determination as to whether he was an employee or not? No, I know. I actually, both parties suggested the Workers' Compensation Act for the definition of an employee, but I don't know that the trial court did. It looked to the site of the case in Brookhaven, and said that Brookhaven had created some type of discrepancy in the law by the Supreme Court on the issue of whether or not the exemption to an employee status required that two Disjunctive or conjunctural. Correct, Your Honor, of course, yes. But if you look at the Brookhaven, Judge Romer was correct in saying that the Brookhaven court concluded that statement. The problem was the view of the district site is referring to Cochrane and Marsh. In those cases, it's not saying that. So that's the problem. So all of the cases, including the ones he said creates a discrepancy, do not. It's always been the same. Dialogue, consideration. Both of those things are present. And since Judge Romer determined that he wasn't acting, he was acting in favor of the business, I don't think the community appreciates you whether or not he was cattle. Okay, good. Any other questions? Good. Ms. Kaczkowski, thank you very much. Thank you very much. Mr. Crawford. Good morning. May it please the court and counsel. Obviously, it is our position, there are a lot of great cases, Obviously, it is our position that Judge Monely's decision should be affirmed in this particular case. And we do take that issue in regards to what was just argued. And I know that Judge Collin brought up the issue of common law. I think if you look at the case, that case that Judge Monely cited in this particular case, Stewart v. Dirk, that goes into the common law principles. And while not only do we believe that Judge Monely should be affirmed, there's a couple of issues that I'd like to address. What does the question as to whether or not he qualifies as an employee under the Workman's Compensation Act have to do with whether or not he's an employee under the terms of the carriage of the policy? Under the terms of the policy, it's very vague. How vague? No, it's just an employee. It's just an employee. You're out of money if you're an employee. Now, it doesn't say anything about Workman's Compensation. It's just an employee. Now, employee is a very well-known term in common law. So why isn't the common law of Pennsylvania dispositive as to whether or not, under the facts of this case, he's an employee or not? I think it is, Judge. I think you have to look at the common law of what a master-servant relationship is. I think you should also look at what we've cited in the brief below and our brief from here. Look at some of the IRS factors that the court has looked at in determining whether or not an employee stands. Look at the Workers' Compensation Act and see what they have to say. The Workers' Compensation Act has a very limited view of what an employee is. It's very limited. It's not as broad as what an employee is under the common law. I agree with you, Judge. But also, if you look at, in terms of the Workers' Compensation Act, how it starts off, it says an employee is a servant. So one of the first things that you should kind of look at is what is a master-servant relationship. And if you look at the Stewart case, the Stewart case that is cited in our brief and is cited within Judge Murley's opinion, those facts are almost identical to the facts of Shaw and Nationwide. If you look at, in terms of compensation, there was no fixed compensation. It was irregular. He came to work, but he still cheated. If it wasn't an employee, what was he? What was he? He was a farmer, a semi-retired farmer, who loved to hang out with animals. He's there on a farm, mucking out stalls, pitching hay, and so forth. What is he legally? Legally, he's a helper. He's not an employee. Well, a helper is an employee. Not necessarily. Shaw did not direct his employment. Shaw did not direct him where he was due to shovel this. The evidence seems to be contradictory to that. That's your evidence, but her evidence is to the contrary, that he was told where they were, how to do it, and so forth. The only thing he was directed to on the day that the Saxon happened, and by the way, the day of the Saxon, he wasn't even asked to be there. And what I get at is employment. When you think of a master-servant employee relationship, you tell them what you want, what you expect to do. Same thing was maybe so in your secretary. You expect him to be there at a certain time. There was no evidence on any side that he was to be there at a certain time. He's the one who said in the tort action, which is before us, Saturdays and Sundays and whenever else I was told. Now, I don't happen to have a secretary, but if I had a secretary, she'd be working Monday through Friday. She'd be expected to be there, and she'd receive pay. He expected to get the hay and the other things that he received with some regularity, obviously, and the amount seems to be fairly straightforward. I mean, that's what he testified to. He testified to that he would go up there on Saturdays and Sundays. That doesn't mean he went up there at work in terms of an employment relationship. Oh, he did not say he was going to hang out with the animals. But I think you've got to look at the record in terms of what Bob Eisenberry is. Bob Eisenberry is a retired farmer. He'd rather hang out with the animals at a barn more than he would rather hang out with people. I mean, it may be difficult for me to understand that, walking around at a farm, quite frankly, is not something that I would do, but if you look at the record of what Bob Eisenberry is as a man and what he was before this particular tragedy happened to him, he loved farm animals. Yeah, but he did receive compensation for being there, and it doesn't matter what the amount of compensation could be. It could be $100,000 or it could be bales of hay and gas money. If you receive compensation for work done, as I understand Pennsylvania law, you're an employee if that's what you're doing. I disagree, Judge. You don't claim he's an independent contractor, do you? I think you can maybe possibly make that argument. I didn't ask, are you making that argument to us today that he's an independent contractor? No, Judge. Then will you acknowledge that he's a casual employee? No, Judge. Then what is he? What is he? He's a helper. He doesn't get any specific help. That doesn't give you a legal definition. He's not an employee. Well, let's look at his statement if you want to say he's not an employee, and I think I'm going to respond to Judge Howard's question. In the appendix, this is from the underlying tort action question, and would you work for three days per week? Answer from Mr. Eisenberg, usually two days a week doing the barn. That's Saturday and Sunday, and the rest of the time he'd call me up if he needed me for anything. So that's his statement. I mean, the question is, when did you work? The answer is, here's when I worked. Now, if we're talking about a common law definition, and we can put aside the purposes of this question for WCA for a second, but if you're talking about a common law definition and what the understanding of Mr. Eisenberg was, clearly that's a reflection of what his understanding is. I agree with you to a certain extent, but when he says work. What do you mean to a certain extent? It's his statement. Because when he says work, that doesn't make no sense. It doesn't make any sense. Other than what all of us in this room think of as work. He has a fifth grade education. He is a farmer. He is helping out a barn. And when you interpret health and with work, that doesn't, just because he was working, you'd have a neighbor come over to your house and dig a ditch for you. Is he your employee? If he comes every Saturday and Sunday and any other time that I tell him. But he didn't tell him. That's the point, Judge. Tim Shaw never told him any specific time to be there. There's no evidence in that record. No specific time of when he's supposed to be there. No specific compensation. Well, what is he? I'm telling you. In other words, the question to you is, isn't this at least a jury question as to whether or not he's an employee under the common law of Pennsylvania? I don't believe he is. To answer that, you've got to take into consideration the evidence from your adversary. And the evidence doesn't show any type of valuable consideration. Well, it's not the amount, sir. It doesn't make any difference, the value that he receives. If he received compensation, $100,000, bales of hay, why isn't this a jury question? In other words, you have summary judgment issued in your favor. And the question is whether a reasonable jury could conclude otherwise, i.e., that he was an employee. I think if you look at the facts of Stewart, and Stewart was in basically the same identical case, almost identical. If you look at the McManus case, McManus and Coon, almost identical set of facts. They all found no employee status, that he was not an employee, even though he did. You look at Stewart, he got some money. You look at McManus, he got a couple of bucks, too. Was there an admission in either of those cases that there was regularity in the manner in which the purported employee in those cases came to the place of business? Absolutely. Look at Stewart. He was there three days a week, every day. And he did it for enjoyment. And that's the same thing Bob does. Bob Eisner, he does it for enjoyment. He doesn't necessarily do it for work. He doesn't do it for compensation. And you look at those whole cases. Were you supposed to discount the statement in regard to when do you work? No, I'm not asking you to discount it. I'm asking you to put it in the context of what Bob Eisner thinks of work. And where are we to look to discern what he thinks of work? Your adversary says here's his statement, and here's what he received with regularity in compensation. She gave us the calculation with regard to the bales of hay. Do you dispute that the bales of hay are valued at some amount and that if you get 15 bales of hay with some regularity that amounts to something? It clearly does, Judge. But is that amounts of valuable consideration? And it doesn't. The bales of hay were 80 cents a bale. Tim Shaw testified that he would sometimes take them, sometimes he wouldn't. There would be no exchange for the amount of work that he would do, that he would take this. And that's what we need when we have an employee relationship, getting back to common law, common law and looking at the Stewart case. There was no fixed compensation. In Stewart, he just worked one summer. Is that correct? I believe he worked over summer. He worked three or four days a week, Judge. Okay. And how many years was this relationship going on? This relationship, he is known for 12 years, Judge. Wow. Now, that doesn't necessarily mean this relationship. No, but it gets back to the question as to whether a jury ought to be making these decisions. I don't think a jury should make this decision, Judge. I think proper evidence was before Judge Monley in deciding this case that there was no employee status. There was no payroll taxes paid. There are cases that say that if the employer is not paying taxes, he's not dispositive whether he's an employee or not. I hear you. He's not dispositive. That's the way of the IRS, but that's the law. It's a piece of evidence, though. You take each of these little pieces of evidence. He didn't pay payroll taxes. There was no fixed wages. There was no set times. He came and went as he pleases. You're saying there was no set times? I just read you what he said. He said he would go up there. What is that? Yeah, so here's what I'd like you to do, if you would, please. Point us to somewhere in the record in which Mr. Eisenberry says, I was just going to be with the animals, and the statement that I made earlier about work, you know, I didn't mean that. This is what I meant by work. I don't think there's any specific testimony by Robert Eisenberry, but if we look at the pleadings and the underlying case, the first part of the case, we put in the pleadings, Bob Eisenberry was not an employee. Nationwide was defending Tim Shaw in that matter. They admitted that he was not an employee in the pleadings that were filed in federal court. That is something that I think should be taken to significance. Significance is the fact that he never filed a workers' compensation claim in this particular matter. This is another case where he went to the workers' comp and they said no. He never filed a workers' compensation case because he never claimed himself an employee. Yeah, but the question for us is whether or not somebody was properly granted. And will you acknowledge this? If a jury is charged with the definition of what an employee is under Pennsylvania law, and that definition includes casual employment as well, that a reasonable jury could, if they wanted to, and I'm not saying you or I would agree or disagree, a reasonable jury could conclude that he is at least a casual employee. I disagree that they could find... Why couldn't they find he was a casual employee? A casual employee is someone who doesn't work regularly, is not steady, is... But he also has to have, and we have this over the screen, he has to have valuable consideration. Well, I think a jury could easily find that. The amount of the remuneration is not a question. It's whether he received, whether he would have worked without receiving the remuneration. That's the question. Well... It's not the amount. The question is only if he received this as part of his... in response to the work. And the amount that he received is never a question. Even if it was unfair. But, Judge, I disagree. If we use an analysis of... Don't get too far from the mic, because we... Sorry. We listen to the tape. As we look at just common sense, to a certain extent, in this particular case, is if I do have a neighbor come over, and I give him... He's helping me with something. It happens all the time. I give him a case of beer. I give him a bottle of wine. Does that mean he's my employee? Does that mean that now I've directed him that somehow he's my employee? That he's somehow my employee? And I'm the same with you. There's no evidence of control in this case. Well, that's actually a little distance from this case. Not necessarily. Yeah, well, you should. He's your employee if he brings over wine every Saturday and Sunday, and you give him something in return for it. Well, I disagree. My neighbor comes over, I give him a bottle of wine, he helps me out. That doesn't mean he's my employee. Hey, bro, you haven't finished your hypothetical. Helping you out doing what? Digging a ditch. Planting a flower. Planting a tree. And that's happening all the time. You're not in the business of raising flowers. For sure, he's in the business of keeping this livestock well. He's in the business of exhibitions. Yes. That is what he's in the business of. The questions of fact that my colleagues are alluding to is really brought to bear when you look at the affidavit from Mr. Eisenberg, right? I've already read to you what he said in the tort action, which I'm sure you're intimately familiar with. And in the affidavit, there are two sections of it I want to bring to your attention. But one section is in response to this question about work, he said, Tim would call me when he needed help, usually 10 or 12 times a year, which is in stark contrast to what he said in the tort action. Isn't that part of the overall mix that my colleagues are alluding to with regard to there are genuine issues of fact here, summary judgments inappropriate? If you also look at the record, Judge, is that he would go up there many times, all the time, without Tim Shaw's even knowing that he was there. There were times he would just go up there, and if you look at what Tim Shaw says, and I ask you to look at that carefully when you read this record. And what do you all think? This is Tim Shaw's deposition. Do you have the impression that Mr. Eisenberg is doing this out of the goodness of his heart? Well, I'm thinking he has. He had a good heart. And, you know, he was willing to help out because I believe he was semi-retired, if not retired. So it gave him something to do. You know, come up, I mean, for example, when you turn the donkey's feet, Mr. Eisenberg has no idea, nothing, no skill, and he's standing there and watches for hours. So, you know, I don't know if he was just there to, you know, companionship, maybe he just doesn't have a family, I'm not sure. But, you know, sometimes I would just say yes, then he came by just to say, for lack of a better word, to fit in. And then getting into the issue of, I think, with the beginning of that common law employer relationship, the question was asked, but is your testimony that each time that he would come and clean the stalls and water and feed the donkeys for the company, he was not expecting to be compensated any faster? Right, because, you know, he didn't come three weeks early, get some hay to feed his animals, and so he said, no, I'll come back and clean six months from now. But what about the next time I clean up and make up for it? And there's also, and what's your testimony that Mr. Eisenberg did not expect, and is your testimony that Mr. Eisenberg did not expect to be compensated in any way for those efforts? I don't know what he expected. But, you know what, you give him some hay, he's no trouble. It should not be an argument that you make to a jury showing that he's just a friend, not an employee. We have a legal question for us, whether or not summary judgment was appropriately granted when, according to your episode, there are facts which a jury could conclude he was an employee under Pennsylvania law. What you're giving us now is his position, which is good for a jury to hear as to his status there. But the question is whether there was evidence to the contrary. That's the legal question then before the court. Bob Eisenberg never, never testified that he was employed. He said in my work, and we have a little semantic argument in terms of how we define an employee or a master servant. Bob said he worked up at that barn. That doesn't mean Bob was compensated for going up to that barn. We also look at not only the times that he was there, look at the master servant in terms of control. And again, I hark back to what Stewart did. And looking at that analysis, and Stewart, McManus, Brower, they're all in line, and they all were decided that the fact that he was not an employee. You look at even some of their cases that they have cited, is that if you plug in the facts in this particular case, you come up with a conclusion that Bob was not an employee. Judge Rundle ruled correctly in this particular matter. Judge Rundle ruled, and looking at the analysis, he did a thorough analysis of this particular case. He looked at Brookings. He looked at Stewart. The facts of Stewart are almost identical to the facts that he had at Barn in this particular case. The same thing with McManus. The same thing with Brower versus Brower, the Brower case. When you look at those facts cited, and then you look at Judge Munley's analysis, he properly analyzed this issue to determine the fact that Bob Eisenberg was not an employee. And that is our position in this particular case, Judge. Any other questions? Mr. Goffert, thank you very much. Thank you for your time. Mr. Kuchelski? Mr. Goffert raises the Stewart case, which I believe was affirmed by the Pennsylvania Superior Court on the summary judgment. In your view, what are the essential differences between this and Stewart? In Stewart, again, the focus was on the traditional concept of the master-servant relationship and the right of the employer to control and resolve the work and to direct the manner in which the work was done. In this particular case, I can point the court directly to the record of evidence, which distinguishes it basically that first, that Eisenberg was moving hay in front of Shaw's business at the time, as the court has already agreed upon. He was, there's testimony that he was directed by Shaw as to how and where to move the hay. In fact, I can quote it. He was responsible for directing how and where that hay was stacked in the loft. The answer was from Eisenberg to Mr. Shaw. The appendix 262 is going to refer to there. Another piece of his testimony, your testimony is that on the day of the incident, you were asked by Mr. Shaw, essentially, to work in the straw that went right. Answer, yes. Question, you were going to slip the straw and Mr. Smell, which is the co-worker, was going to stack the hay, but it's correct. Answer, yes. Refer to appendix page 259. Well, what about in store? The miner was helping out, wasn't he, on the sanitation job? Well, that's just it, Your Honor. The critical difference is that it was a minor collection that was purely helping out. He was doing it only for, basically, a jewelry line. But he was under the direction. If he was helping out, he was under the direction. Well, there's two principal distinguishing factors, then. One is, in this case, the testimony is that Mr. Eisenberry worked for Mr. Shaw for 12 years, 12 years, two times a day. That's obviously much more continuous and regular in nature than a minor child helping someone pick up trash cans on an occasional basis. But more importantly, Mr. Eisenberry testified in response to my deposition questioning that the amount of hay he received was in direct response to the amount of work that he did for Mr. Shaw. And that's in my opinion. It's page 422. So, again, that's a huge distinguishing factor, in my opinion, because he admits that he received consideration. And if that consideration was granted to him in direct relationship with the work that he performed for Mr. Shaw, which is completely different, in my opinion, than allowing a child to ride in the back of a garbage truck with the absolute expectation of being paid. And another thing that I found very quickly is that Mr. Eisenberry also testified in response to my questioning that he was never discharged from work before his fall. And it equals to my question, did he quit prior to his fall that day? Did he have personnel with Mr. Shaw? Either way, they'll both have been extinguished for the day to tell you he could leave. The answer really didn't. So, according to Mr. Eisenberry's state of mind, at least it should be similar to a jury, he is under the impression that he worked it out on a regular basis. He was going to receive consideration in his direct relationship with the work that he was going to perform. The work was very laborious in nature and he was directed as to how to perform the service as well on the premises. And also, he believed that he didn't need to be discharged or at least give guidance on Mr. Shaw. And there were other testimonies as well regarding just equipment usage and things like that. Mr. Eisenberry had used the ladder. Other prominent people had performed services for Mr. Shaw and were made aware that he was not going to move to the site. Those are also considerations on your term in the master-servant relationship. Do we need to adopt your sham affidavit view in order to reverse? I don't think you do. I don't appreciate sham affidavits, but in my opinion, I think there is enough record evidence on the actual record at the affidavit to justify your judgment. I think that the sham affidavit solidifies if there is an issue of fact-creating, but I think that the law doesn't come about it. And with the three seconds left to our time, just two real quick points just to correct the record. My advocate had, or my adversary had stated that Mr. Shaw was not going to be reimbursed for defending him in the underlying case. Well, of course, nationwide is not a client in the underlying case. They defend the insured. They pay for the defense, but that's it. It was Shaw who took the position, and he was on the acquittal, and he did so, obviously, for his own purposes. And to say that no risk compensation fine was presented in that scenario, again, I object to that because we don't carry risk compensation. And so that's what I've seen has moved it to this point. Thank you very much. Good. Thank you very much. Any further questions? The case was extremely well argued by both lawyers. We thank counsel. Take the matter under advisement.